DECISION
This matter is before the Court for a decision after a jury waived trial involving the interpretation of the parties' obligations pursuant to a purchase and safes agreement.
The property in question, an undeveloped lot in Tiverton, was purchased by the plaintiffs in October of 1992 for $116,000. The couple subsequently determined that they no longer wished to build upon it and decided to sell the parcel. To that end they enlisted the professional assistance of Aphrodite "Chee" Laurreano, a broker whose husband had developed the area. The property was originally listed at $124,000 but no offers were forthcoming. The price was eventually reduced to $109,000. Mrs. Laurreano first met the defendant, Mrs. Marilyn Nassif, in March of 1995, when the latter expressed an interest in the development. After inspecting the site, defendant offered to purchase plaintiff's lot for $90,000. Mrs. Laurreano communicated this to to plaintiffs who counter-offered with $101,000. Negotiations ensued culminating with an agreement on April 3, 1995 that the lot would be sold to defendant for $99,000. The plaintiffs were induced to lower the price by the fact that a quick closing would be arranged because it was a cash sale. According to Mrs. Laurreano, who never met or talked to defendant's husband, "it was very clear" that she (Mrs. Nassif) was purchasing the lot herself. The closing date was extended several times from April 15, 1995 to August 31, 1995. Mrs. Laurreano testified that after May 31st, "absolutely all the extensions were defendant's fault. She (defendant) was completely inconsiderate.., there was nothing we (plaintiffs and broker) could do."
On August 9, 1995, defendant's husband, at the request of a mortgage broker, signed the original Purchase and Sale Agreement and the accompanying documents. Sadly, Mr. Nassif deceased on September 5, 1995 and Mrs. Nassif refused to go forward with the agreement. She argues that her husband's death has extinguished her obligations.
Mrs. Patricia Ann Stout-Carter testified that she moved to Rhode Island from the state of Washington, hoping to secure employment with the Navy in Newport. (Her husband had retired from the Navy in 1991 and was working in Fall River. Mrs. Carter had been a Navy cooperative student in Washington) With hopes of settling in Rhode Island, the couple purchased the lot intending to build a home. At the same time, however, the government was downsizing and Mrs. Carter was forced to look elsewhere for employment. She got a job in Boston and the couple bought a home in Tauton. They were eager to sell the lot in Rhode Island because they had a balloon payment due on their mortgage in October of 1995. Despite the fact that defendant's offer was below the listing price, plaintiffs accepted because it was a cash transaction which would expedite the closing date. After Mr. Nassif's death, on September 5, 1995, Mrs. Nassif asked for the return of the $5,000 deposit. Over one month later, on October 31, 1995 defendant purported to exercise her right to reject deed restrictions. She had been aware of them since the inception of the agreement which allowed her 7 days to reject them. The evidence is undisputed that Mr. and Mrs. Carter, whom the court finds completely credible, remained ready, willing and able to close at all times. Mrs. Nassif, on the other hand testified as follows. "I did not want to build alone, the only reason I did not buy the land is because my husband died."
The pertinent language in Paragraph 18 of the contract at issue provides that the agreement ". . . shall be binding upon and inure to the benefit of the heirs, administrators, executors, successors and assigns of the respective parties hereto. If two or more persons are named as seller or buyer, their obligations hereunder shall be joint and several."
It must be noted that Mrs. Nassif is an experienced and competent business woman with personal assets exceeding one million dollars. After her husband's death in the fall of 1995 she cashed in a $50,000 certificate of deposit, sold her home in Florida, took over as head of her husband's produce company, arranged for an addition to be constructed on company property and gave away (by December 1995) $100,000 to her children.
The language of Paragraph 18 could not be more clear in its purpose to insure enforceability of the agreement in the event of any party's death. Initially, the court must determine whether or not Mr. Nassif was a party or a mere ineffectual signatory. As plaintiff has pointed out, the uncontradicted evidence reveals that he signed the document 120 days after the original signatures, 100 days after the original cash closing date and 70 days after plaintiffs were ready, willing and able to perform. Thus, Mr. Nassif could not possibly have participated in any "meeting of the minds." He never participated in any negotiations or even conversations. Neither the plaintiffs nor the real estate broker ever spoke with him. The credible evidence supports only one conclusion. Mrs. Nassif embarked upon a search for a lot alone, negotiated the transaction alone, then decided she wanted to secure a $250,000 construction loan for what she needed her husband's signature. By this time, she had bound herself to go forth with a cash closing and without a mortgage, or any other, contingency. She could not unilaterally introduce new terms or new parties to the agreement. In the courts view, her obligations remained unchanged and could not be altered by any act subsequent to her entering into the binding agreement with the plaintiffs.
It is terribly sad that Mrs. Nassif lost her husband and therefore any motivation to honor the contract. However, it would be inequitable for the blameless plaintiffs to suffer a loss because of defendant's breach. The court, based on its observations, feels that the plaintiffs were most reluctant to bring this case to court and that they were very sympathetic to Mrs. Nassif's plight. However, a trial became necessary to resolve this dispute. The credible evidence overwhelmingly supports the conclusion that plaintiffs were in total compliance with their contractual obligations and remained ready, willing, and able to close. None of the defenses raised are applicable and court is compelled to reject them.
With reference to damages, plaintiffs have asked this Court to award $41,674.85 plus interest, costs, and attorney fees. The Court cannot and will not award costs and attorneys fees to any prevailing party without a hearing demonstrating the reasonableness of the sums requested.
It is unquestionable that plaintiffs acted with the utmost diligence to mitigate damages after defendant's breach.
Our Supreme Court has held that the trial court may award damages for breach of contract to place the injured party in as good a position as if the parties fully performed the contract Wells v. Uvex Winter Optical,Inc., 635 A.2d 1188 (R.I. 1994). With specific reference to damages for breach of a purchase and sale agreement this court is guided by Riley v.St. Germain, 723 A.2d 1120 (R.I. 1999). In that case plaintiff's breached by refusing to close on defendant's residence which they had agreed to purchase for $320,000. Defendants were unable to sell the property for three years, and, due to a decline in the real estate market at a severely reduced price. Defendants recovered not only the difference in price ($95,000), but all the carrying costs including utilities, maintenance, taxes, pest control, and security. (Approximately $48,000).
The Carters sold the lot in March of 1998 for $85,000. Furthermore, Mrs. Laurreano originally had negotiated her commission down to $2,500. At this closing plaintiff had to pay 6% of $85,000, i.e. $5100, representing a loss of $2600. Therefore, Mr. and Mrs. Carter are entitled to recover $16,600. Additionally, they were forced to "carry" their unsold lot from, , November, 1995 (the date of relisting) to March 19, 1998, the date the property was deeded to Kevin Boulay. It is clear, per the ruling of St. Germain, that the plaintiffs must be compensated for all carrying costs associated with the parcel they were forced to retain until the conveyance in March of 1998. All of the expenses of interest and taxes, must be borne by the repudiating party. However, the court knows of no authority allowing an award for consequential damages which were not contemplated nor foreseeable by the parties at the time the contract was executed. See footnotes to 77 Am Jr.2d Vendor Purchaser
§ 579 "Incidental Consequential Damages." Thus, the court can not lawfully or equitably award the sum which represents expenses incurred in the Carters' refinancing transaction, viz., $2535.02.
The Court finds that due to defendant's breach plaintiffs were forced to carry the property from October 1995 to March of 1998 at a total cost, including interest and taxes, of $21,814.83.
Judgment shall enter for Patricia and Larry Carter for $38,414.83.